# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JACK VINCENT JOHNSON,

     Plaintiff,

  v.

            Case No.  03-C-967

MATTHEW J. FRANK, DAVID BURNETT,
SHARON ZUNKER, GEORGE M. DALEY,
JAMES LABELLE, SHERI HEINZ,
JAMES R. WONG, KERIN F. SIRIN,
GARY BRIDGEWATER, ENRIQUE LUY,
MICHAEL LUCEY, DAVID MAHVI and
PATRICE KENNEDY,[1]

     Defendants.

## OPINION AND ORDER

  Jack Vincent Johnson, who was a prisoner in the custody of the State of Wisconsin when this action was filed, is suing thirteen employees of the Wisconsin Department of Corrections in their personal capacities for depriving him of his rights under the Eighth Amendment while he was incarcerated.  He is seeking money damages pursuant to 42 U.S.C. § 1983.  The Defendants have answered and have denied liability.  After the deadline for the completion of all discovery had passed, the Defendants moved for summary judgment on the grounds that no material facts are in dispute and that they are entitled to

---

[1]Defendants named as "Unknown Employees of WDOC" are dismissed as parties.  The Plaintiff has never identified these anonymous Defendants.  Defendant "Administrator of University Wisconsin Hospitals & Clinics" was dismissed in the court's Opinion and Order of April 25, 2005.

judgment as a matter of law.  See Federal Rule of Civil Procedure 56(c).  The movants have

stated in a letter that they will not be filing a reply, so this matter is now fully briefed.

## I. **FACTS**

The record shows that, while Johnson was in Wisconsin prisons,[2] he was

diagnosed with a hernia, cirrhosis of the liver, kidney stones, gallstones, and hepatitis C.

Johnson claims that the care and treatment he received from the Defendants was

constitutionally inadequate.

When Johnson entered the Wisconsin prison system, he was first assigned to

the Dodge Correctional Institution where he was examined once by Defendant Sirin, a

physician.[3]  Dr. Sirin filed a request to conduct an ultrasound of Johnson's gallbladder, but the

request was denied by Defendant Daley, a physician who was the Medical Director for the

Wisconsin Department of Corrections.  Dr. Daley had concluded that gallstones were not

causing Johnson problems at the time.

On April 20, 2000, Johnson was transferred to the Columbia Correctional

Institution where he was seen once by Defendant Bridgewater, a physician employed by the

Wisconsin Department of Corrections.  Later that year, Johnson was transferred to out-of-

---

[2] Johnson says that he entered the Wisconsin prison system in 2000.  He was transferred to out-of-state facilities later that year and remained out of state until 2003, when he was transferred to a prison in Wisconsin.  In December of 2004, he was released.

[3] Johnson says that he was examined and treated by Defendant Wong, but the Defendants say that their records show that Wong, a medical doctor, never had contact with Johnson.  They say that Wong has a serious medical condition and has no recollection of this time period.

Johnson has produced no records or other evidence to counter the Defendants' contention that Wong was not personally involved in the incidents giving rise to this lawsuit, so the claims against Wong will be dismissed because there is no liability without personal involvement under section 1983.  See Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001).

-2-

state facilities. In 2003, he returned to Wisconsin and was incarcerated at the Fox Lake Correctional Institution. There, he was treated by Defendant Luy, a medical doctor.

Dr. Luy referred Johnson to the University of Wisconsin Hospitals where he was evaluated for a liver transplant. Doctors there also diagnosed a reducible right indirect inguinal hernia. Johnson was given a sweat belt to reduce pain and could have pain medication upon request.

The Defendants have offered the following "facts" in chronicling Johnson's subsequent history of medical treatment by Dr. Luy:

> 36. On February 12, 2003 Mr. Johnson was approved for right inguinal hernia repair. The appointment was made and Dr. David Mahvi evaluated him at UW Madison General surgery on April 15, 2003.
>
> 37. On February 17, 2003 Mr. Johnson was evaluated initially by Patrice Kennedy, Nurse Practitioner at UW Hepatology, where she recommended a screening lab triphasic CT of abdomen and upper endoscopy to recheck banding of the esophageal varices.
>
> 38. On March 6, 2003, a repeat upper endoscopy by Dr. Gaummitz had a finding of grade 1 varices at lower esophagus with distal esophageal scarring related to previous banding.
>
> 39. A March 11, 2003 CT Scan showed no hepatoma, cirrhotic liver with multiple varices and splenomegaly and dysplastic nodules in the liver.
>
> 40. On March 21, 2003, when Mr. Johnson was experiencing severe abdominal pains, Dr. Luy prescribed oxycodone 10-mgm every 6 hours when requested.
>
> 41. Dr. Mahvi recommended outpatient open right inguinal hernia repair. At that visit, the hernia was becoming increasing bothersome on a daily basis, but he was already placed on oxycodone 10-mgm every 6 hours as needed by Dr. Luy on March 21, 2003.

-3-

42.    Dr. Mahvi, however, was concerned about performing surgery because of the extent of his liver disease with portal hypertension.  Pre-operative labs that included INR and albumin to assure ascitis [sic] and potential bleeding diathesis were ordered.

43.    On April 1, 2003, Mr. Johnson had a follow-up visit with Patrice Kennedy where it was revealed that he had genotype 1B and would have a "very low chance of sustained viralogic response" and, therefore, treatment with Pegintron, with or without Ribavirin, was not recommended as "the risks do not out weigh the benefits."  The recommendation was to follow-up liver tests and biphasic CT every 6 months and a return appointment in 6 months.. Mr. Johnson was not considered for liver transplant at this point in time.    Patrice Kennedy also stated that Mr. Johnson's energy was fair and he was sleeping well.  Mr. Johnson was taking oxycodone 10-mgm daily and was getting constipated.  Dr. Luy substituted oxycodone with Tylenol 650-mgm every 6 hours on April 8, 2003 for mild to moderate pains.

44.    On May 12, 2003, Sue McMurry, Registered Nurse and liaison/coordinator at Fox Lake Correctional who oversees Mr. Johnson's health concerns, saw him with intermittent abdominal pains that occurred every 1-2 weeks lasting 1-2 days and chronic edema of his ankles.

45.    On May 22, 2003 Dr. Luy saw Mr. Johnson and prescribed aldactone and Tylenol with codeine 2 tablets every 8 hours only (due to compromised liver cirrhosis) for the abdominal pains related to the stretching of the liver capsules.

46.    On June 26, 2003 the scheduled surgery was cancelled with the recommendation that GI/Hepatology do further work ups and conduct an ultrasound to evaluate ascitis [sic].

47.    On July 7, 2003 Sue McMurry saw Mr. Johnson wherein he voiced his concern about his prognosis and wanted to be placed on the liver transplant list.

48.    On July 18, 2003, multiple gallstones either in the gallbladder neck or proximal common bile duct were revealed for the first time at the repeat CT scan of the abdomen.

49.    When the gallstones were revealed, Mr. Johnson was having biliary colic pain so Dr. Luy ordered Codeine 30 mg. 1-2

-4-

tablets 3x a day as needed, avoiding Tylenol entirely. Inventory of controlled substances from September 16, 2003 through November 6, 2003 showed that Mr. Johnson was taking only the most [sic] 60-mgm Codeine once or twice daily. The apparent reason is per his admission to Patrice Kennedy of increased constipation secondary to codeine use. Mr. Johnson had a lactulose order for constipation, but he shunned it because of flatulence and bloating.

50.    On August 8, 2003 Dr. Luy increased Mr. Johnson's prescription of Codeine from 30 to 60-mgm 2 tablets every 4 hours as needed for pain management of the gallbladder colic and right groin pains.

51.    Dr. Sadowski of UW radiology recommended an MRI which was done on September 8, 2003, which revealed that the small 1.0x2.2 cm Left adrenal mass was unchanged in size compared to CT of March 11, 2003 and favors a benign etiology.

52.    On May 19, 2004, Mr. Johnson underwent right inguinal hernia repair by Dr. Mikhelson, general surgeon at Waupun Memorial Hospital, and a choleocystectomy [sic] at UW Hospital Madison on June 8, 2004.

Defendants' Proposed Findings of Fact and Conclusions of Law at ¶¶ 36-52 (citations

omitted).

After Johnson returned to Wisconsin, he was also treated by Defendant Patrice

Kennedy, a nurse practitioner. The Defendants have provided the following account of the

Plaintiff's treatment by Kennedy:

63.    Jack Johnson was initially seen by Ms. Kennedy on 2/17/03. He reported being diagnosed with Hepatitis (Hep.) C in 2000 while incarcerated and was transferred to Tennessee, where on December 11, 2002, he developed a variceal bleed. Upper endoscopy at that time revealed full column esophageal varices, which were banded. He also developed ascites after his bleed. His risk factor for Hep. C was reported as a blood transfusion in Vietnam in 1968. Mr. Johnson reported intermittent right upper quadrant pain every one to two weeks and diminished energy. At that visit a triphasic CT of the abdomen was ordered, his propranolol dose was increased to 15 mg twice daily to

-5-

decrease his risk of rebleeding, repeat upper endoscopy to reassess the status of his varices. Hep. A immunization if the patient had no evidence of antibodies, and that he return to clinic within 4-6 weeks with completion of above tests. It was explained to Mr. Johnson that he would most likely need a liver transplant at some point in the future and that we would need more information regarding his Hep. C strain of virus and the results of the above tests before recommendations about treatment with interferon and ribavirin occur.

64.    Mr. Johnson was seen again on 4/01/03.    Upper endoscopy revealed grade 1 varices in the lower esophagus and gastropathy in the stomach.   CT revealed no briskly enhancing arterial lesions to suggest hepatocellularcarcinoma.   Cirrhotic configuration to liver with multiple varices and enlarged spleen. There were multiple low attenuation lesions of the liver consistent with regenerating or dysplastic nodules.   Continued treatment with acid suppression and propranolol was ordered and continued lab monitoring and repeat CT scan in six months with follow-up clinic appointment at that time.   Given that Mr. Johnson had a history of decompendsated [sic] cirrhosis with variceal bleed and history of ascites and that the strain of Hep. C virus was IB, which was more difficult to irradicate [sic], less than 10 percent chance, it was explained to him that the risks of treatment with interferon and ribavirin would not outweigh the benefits.

65.    Mr. Johnson was seen again 7/22/03. He was complaining of worsening right upper quandrant abdominal pain. He had been scheduled for a right inguinal hernia repair, but this was reportedly cancelled at the last minute due to anesthesia's concern about the status of his liver.   He had undergone a second CT scan of the liver.   This revealed no early enhancing lesions to suggest hepatoma. Cirrhosis with enlarged spleen and collaterals. Probable left adrenal mass. Its characteristics on this CT are not compatible with a simple adenoma, and further evaluation by unenhanced CT or MRI was recommended. Probable left renal cyst. Multiple gallstones including a gallstone which appears to be in the gallbladder neck or proximal common bile duct. Mr. Johnson's liver tests had worsened with his platelet count dropping to 80's and his INR 1.4.   Mr. Johnson was discussed in detail with Dr. Michael Lucey, our section chief and Hepatologist here. Their recommendations were: 1. To refer the patient back to see Dr. David Mahvi for consideration of a cholecystectomy and repair of his right inguinal hernia, given Mr. Johnson was symptomatic.  2.  Consideration will be given for a

-6-

TIPS procedure (this wold decrease his risk for future varicel bleed) should the surgeon wish this completed prior to surgery. 3. Refer Mr. Johnson to Endocrine Clinic to evaluate the left adrenal mass and if he is not seen in Endocrinology within the next 3 months, to complete a noncontrast CT with special attention to his mass. 4. Continue with use of propranolol twice a day to keep his pulse within the 50 to 60 range. 5. Codeine 30 to 60 mg as needed for abdominal pain. Avoid Tylenol. 6. To have Mr. Johnson return back for follow up in 3 months' time or call sooner should there be any worsening symptoms. It was explained to Mr. Johnson that he could not be considered for a liver transplant until it was determined whether the adrenal mass was malignant.

66. Ms. Kennedy's fourth visit occurred on 10/2/03. Mr. Johnson was complaining of increased constipation due to codeine use for his right upper quadrant abdominal pain and continued right groin pain from his inguinal hernia. He had had a MRI to further evaluate his adrenal mass on 9/8/03. The lesion did not have imaging characteristics of a lipid-rich adenoma. However, certain signal characteristics and overall stability favored a benign etiology. A lipid poor adenoma or adrenal hemorrhage would be considerations. A follow up CT scan in six months utilizing a dedicated adrenal protocol sequence including pre-contrast, post-contrast and fifteen-minute delayed images was recommended. Recommendations from this visit were to refer Mr. Johnson back to the General Surgery Clinic for reconsideration of repair of his right inguinal hernia and for a cholecystectomy. It was once again reiterated that Ms. Kennedy would be willing to do a TIPSS procedure should the surgeon want this completed prior to surgery. Mr. Johnson was to continue follow up with Endocrine Clinic for his adrenal mass and was to continue to use codeine as needed for his abdominal pain. Schedule MiraLax, starting at 17 g per day and titrating up as high as 34 g twice a day was given for constipation. Mr. Johnson was also to continue the propranolol. Lab studies to monitor his liver and gallbladder were ordered. These included a CBC, platelet count, INR, electrolytes, BUN, creatinine, alkaline phosphatase, total bilirubin, AST and ALT drawn every two to three months. These were to be sent to all clinic visits. Mr. Johnson was to return back for follow up in two to three months, or call sooner should there be any worsening symptoms.

67. Ms. Kennedy's final visit with this patient occurred on 12/3/03. Her recommendations from that visit included: 1. Due

to Mr. Johnson's anger towards her, she felt that for his next visit, it would be best if he met with the section chief and Hepatologist Dr. Michael Lucey to discuss any other options with him. 2. He should continue to have CBC, platelet count, INR, and liver tests, as well as alpha-fetoprotein every six months. Those results were to be faxed to Ms. Kennedy when they were completed. 3. He will need monitoring for hepatoma and if he is having a MRI of the abdomen in May, which should suffice for that, but otherwise he will need biphasic CT scans every six months. 4. For his poorly-controlled pain, please try hydrocodone 5 mg one to two tablets twice a day as needed rather than the codeine, which is most likely more constipating. 5. For his chronic constipation, a trial of docusate with casanthrol one to two tablets one to two times a day according to symptoms. 6. Have Mr. Johnson return back to follow up to see Dr. Lucey in three months' time. Call sooner if there are any concerns.

Defendants' Proposed Findings of Fact and Conclusions of Law at ¶¶ 63-67 (citations omitted).

Defendant Shari Heinz, a registered nurse, assisted in scheduling and rescheduling Johnson's hernia surgery. She first scheduled the surgery with Defendant David Mahvi, a surgeon employed by the University of Wisconsin Medical School. The surgery was cancelled because of the anesthesiologist's concern about Johnson's health with respect to his liver disease. See Affidavit of Mahvi at ¶ 4. The surgery was rescheduled at Waupun Memorial Hospital after Dr. Mahvi was named as a defendant in this lawsuit and was reluctant to treat Johnson. The hernia surgery was performed on May 19, 2004. On June 8, 2004, Johnson underwent a cholecystectomy (gall bladder removal) at the University of Wisconsin Hospitals.

The remaining Defendants include James LaBelle and Sharon Zunker who are employed by the Wisconsin Department of Corrections as Health Services Nursing Coordinators. They are responsible for health policy development and implementation at the

Wisconsin Department of Corrections. Defendant David Burnett is a physician employed by the Wisconsin Department of Corrections as the Medical Director of the Bureau of Health Services. Defendant Matthew Frank is the Secretary of the Wisconsin Department of Corrections.

Johnson was released from the Wisconsin prison system in December of 2004. He now resides in Ohio and says that he is a patient at the Cleveland Clinic where he is being treated for cancer, among numerous other conditions.

## II. <u>LEGAL STANDARDS FOR SUMMARY JUDGMENT</u>

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the nonmoving party." <u>Dempsey v. Atchison, Topeka and Santa Fe Railway Company</u>, 16 F.3d 832, 836 (7th Cir.) (citations and quotation marks omitted), <u>cert. denied</u>, 513 U.S. 821 (1994).

Parties seeking summary judgment bear the initial responsibility of informing a court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. The moving parties may discharge their "initial responsibility" by simply " 'showing' – that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." Id, at 325. When the non-moving party would have the burden of proof at trial, the moving parties are not required to support their motion with affidavits or other similar materials negating the opponent's claim. See Id. at 323 & 325; Green v. Whiteco Industries, Inc., 17 F.3d 199, 201 n.3 (7th Cir. 1994); Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving parties may, if they choose, support their motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. See Kaszuk v. Bakery & Confectionery Union & Industrial International Pension Fund, 791 F.2d 548, 558 (7th Cir. 1986); Bowers v. DeVito, 686 F.2d 616, 617 (7th Cir. 1982); Faulkner v. Baldwin Piano & Organ Co., 561 F.2d 677, 683 (7th Cir. 1977), cert. denied, 435 U.S. 905 (1978).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on his pleadings. See Federal Rule of Civil Procedure 56(e); Donovan v. City of Milwaukee, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Federal Rule of Civil

Procedure 56(e); see also Anderson v. Liberty Lobby, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. See Matsushita Electric Industrial Company v. Zenith Radio Corporation, 475 U.S. 574, 586 (1986); Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992). Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. See Haywood v. North American Van Lines, Inc., ''121 Patent F.3d 1066, 1071 (7th Cir. 1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. at 252.

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 234 (7th Cir.) cert. denied, 515 U.S. 1104 (1995); Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 443 (7th Cir. 1994); Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. See Anderson, 477 U.S. at 249-50; Doe, 42 F.3d at 443.

-11-

## III. DISCUSSION AND DECISION

At the outset the court notes that it has been hampered in reviewing the summary judgment documents by the parties' frequent use of medical terms, medical jargon, names of proprietary drugs, initials, and abbreviations, which the parties do not define or explain. Some of the terms were misspelled. See, e.g., "ascitis" instead of "ascites" in Defendants' Proposed Findings of Fact and Conclusions of Law at ¶ 42; "choleocystectomy" or "cholesystectomy" instead of "cholecystectomy" in Defendants' Proposed Findings of Fact and Conclusions of Law at ¶¶ 52 & 61. As a result, the court could make little sense of the raw medical records relied upon by the parties.

### A. STATE LAW CLAIMS

The Defendants maintain that, because the Plaintiff's Second Amended Complaint does not plead compliance with Wisconsin's Notice of Claim statute, Wis. Stat. § 893.82, any state law negligence claims must be dismissed. In Wisconsin, a condition precedent to filing a negligence claim against a state employee, is to file a notice of claim with the Wisconsin Attorney General. Riccitelli v. Broekhuizen, 227 Wis.2d 100, 110-11, 595 N.W.2d 392, 397 (1999); Lamoreux v. Oreck, 275 Wis.2d 821, ____, 686 N.W.2d 722, 724 (Ct.App.), review denied, 276 Wis.2d 29 (2004). Johnson has not responded to this prong of the Defendants' motion and has made no showing that he has filed a state notice of claim. Therefore, all his state-law negligence claims will be dismissed.

-12-

## B. PERSONAL INVOLVEMENT

Next, the movants argue that all claims against Defendants Matthew Frank, David Burnett, Sharon Zunker, James LaBelle and James Wong must be dismissed because Johnson has not demonstrated that they had any personal involvement in the events leading to his alleged injuries. All Defendants are being sued in their personal capacities only. Matthew Frank is the Secretary of the Wisconsin Department of Corrections (DOC). James LaBelle and Sharon Zunker are Health Services Nursing Coordinators with the Wisconsin DOC. David Burnett is the DOC's Medical Director of the Bureau of Health Services. And, James Wong is a physician once connected with the DOC.

Section 1983 does not allow actions against individuals merely for their supervisory role of others. See Zimmerman v. Tribble, 226 F.3d 568, 574 (7th Cir. 2000). Individual liability under 42 U.S.C. § 1983 can only be based upon a finding that the Defendants caused the deprivation at issue. See Kelly v. Municipal Courts of Marion County, 97 F.3d 902, 909 (7th Cir. 1996). In addition to the element of deliberate indifference, Section1983 Eighth Amendment claims against individuals require personal involvement in the alleged constitutional deprivation to support a viable claim. See Zentmyer v. Kendall County, Illinois, 220 F.3d 805, 811 (7th Cir. 2000); Zimmerman, 226 F.3d at 574; Davis v. Zirkelbach, 149 F.3d 614, 619 (7th Cir.1998), cert. denied, 525 U.S. 1121 (1999). Although direct participation is not necessary, there must at least be a showing that a Defendant acquiesced in some demonstrable way in the alleged constitutional violation. See Kelly, 97 F.3d at 909; Rascon v. Hardiman, 803 F.2d 269, 274 (7th Cir. 1986). To prevail on his claims, the Plaintiff must establish that the Defendants were aware of facts from which the inference

-13-

could be drawn that a substantial risk of serious harm to Johnson existed and that they

disregarded the risk. See Lewis v. Richards, 107 F.3d 549, 553 (7th Cir. 1997).

Johnson has failed to make any showing that any of these five Defendants were

personally involved in exhibiting deliberate indifference to his serious medical needs.

Therefore, the claims against them will be dismissed. See Palmer v. Marion County, 327 F.3d

588, 593-94 (7th Cir. 2003).

## C. DELIBERATE INDIFFERENCE

Johnson clams that the remaining eight Defendants violated his Eighth

Amendment rights by acting with deliberate indifference to his serious medical needs.    The

Seventh Circuit has explained the origin of such a claim as follows:

> "[T]he primary concern of the drafters [of the Eighth Amendment's
> prohibition on 'cruel and unusual punishments'] was to proscribe
> 'torture[s] and other barbar[ous]' methods of punishment." Estelle
> v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251
> (1976) (quoting Granucci, Nor Cruel and Unusual Punishment
> Inflicted: The Original Meaning, 57 Calif.L.Rev. 839, 842 (1969)).
> Nevertheless, recent Supreme Court decisions have held that the
> Eighth Amendment proscribes more than just "physically
> barbarous punishments." Estelle, 429 U.S. at 102, 97 S.Ct. at
> 290. "The Constitution does not mandate comfortable prisons, but
> neither does it permit inhumane ones, and it is now settled that
> the treatment a prisoner receives in prison and the conditions
> under which he is confined are subject to scrutiny under the
> Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, ----, 114
> S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (internal citations and
> quotation marks omitted). Such "treatment" and "conditions"
> include a prisoner's medical care, for the government has an
> "obligation to provide medical care for those whom it is punishing
> by incarceration." Estelle, 429 U.S. at 103, 97 S.Ct. at 290.

Snipes v. DeTella, 95 F.3d 586, 590 (7th Cir. 1996), cert. denied, 519 U.S. 1126 (1997).

-14-

Recently, the appellate court has set forth the following legal standards to be followed by a district court faced with a prisoner's claim of constitutionally inadequate medical care:

> Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component. To satisfy the objective component, a prisoner must demonstrate that his medical condition is "objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotations omitted); *see also Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir.2002). A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. *See Foelker v. Outagamie County*, 394 F.3d 510, 512-13 (7th Cir.2005). To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a " 'sufficiently culpable state of mind.' " *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The officials must know of and disregard an excessive risk to inmate health; indeed they must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. This is not to say that a prisoner must establish that officials intended or desired the harm that transpired. *Walker*, 293 F.3d at 1037. Instead, it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk. *Id*. Additionally, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970.

Greeno v. Daley, 414 F.3d 645, 652-53 (7th Cir. 2005).

The movants have not argued that Johnson's medical conditions are not objectively, sufficiently serious. He has been diagnosed with cirrhosis of the liver, kidney

-15-

stones, gallstones and hepatitis C. Although the record is not clear, it appears that Johnson's

medical conditions predate his incarceration in Wisconsin. For example, he reported to the

Defendants that he developed hepatitis C as a result of a blood transfusion in Vietnam. The

dispositive question, then, is whether the Defendants acted with a sufficiently culpable state

of mind when they treated Johnson.

This is not a case where the prisoner received no medical care. The record

leaves no doubt that Johnson was treated for gallstones, kidney stones, a hernia, and liver

disease. Instead, Johnson objects to the course of treatment. He is critical of almost every

aspect of the medical care that he received at the hands of the remaining Defendants. He

complains that his pain was not alleviated, that he was subjected to some delays in treatment,

and that he was not given a liver transplant.

To prevail on his claims, Johnson has to show that the treatment that he did

receive was so blatantly inappropriate as to evidence intentional mistreatment likely to

aggravate his condition seriously. See Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996),

cert. denied, 519 U.S. 1126 (1997). Neither medical malpractice nor a mere disagreement

with a doctor's medical judgment amounts to deliberate indifference. See Estelle v. Gamble,

429 U.S. 97, 106 (1976); Estate of Cole by Purdue v. Gromm, 94 F.3d 254, 261 (7th Cir.

1996). The Seventh Circuit has warned that:

> [T]he Eighth Amendment is not a vehicle for bringing claims for
> medical malpractice. See Estelle, 429 U.S. at 105, 97 S.Ct. at
> 291; Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir.1996) ("[T]he
> courts have labored mightily to prevent the transformation of the
> Eighth Amendment's cruel and unusual punishments clause into
> a medical malpractice statute for prisoners."); Oliver v. Deen, 77
> F.3d 156, 159 (7th Cir.1996) ("Medical malpractice ⋯ is not a
> violation of the [Eighth] Amendment."). Medical decisions that
> may be characterized as "classic example [s] of matter[s] for

-16-

medical judgment," <u>Estelle</u>, 429 U.S. at 107, 97 S.Ct. at 292-93, such as whether one course of treatment is preferable to another, are beyond the Amendment's purview. Such matters are questions of tort, not constitutional law.

Throughout his brief, Johnson second-guesses most of the decisions made by his physicians and other medical personnel. However, he has not established that he is competent to testify to the proper standard of medical care and he has presented no expert opinion bearing on the subject.

Before dispositive motions were filed, this court contacted the Medical College of Wisconsin in an attempt to appoint an expert to evaluate Johnson's care. No one from the Medical College volunteered. However, by the time the Defendants filed their motion for summary judgment, Johnson was no longer incarcerated. He says that he is now being treated at the Cleveland Clinic in Ohio and that doctors from that Clinic, as well as his family doctor, would "assist as witnesses." Plaintiff's Answer [to summary judgment motion] at 4. Even though the Defendants warned Johnson of his obligation to oppose the summary judgment motion with affidavits or other evidence, he has not filed any affidavits or other papers from these physicians which would support his claims. Moreover, he did not name any expert by the October 15, 2004, deadline. <u>See</u> Scheduling Order of July 2, 2004.

Without competent medical testimony, the court has no basis for finding that there is a genuine issue for trial as to whether any of the Defendants knew that the medical treatment they were providing to Johnson presented a serious risk to his health. For example, there is not a scintilla of evidence in the record to establish that Johnson was a fit candidate for a liver transplant while he was incarcerated in Wisconsin. To the extent that any of the treatment decisions made by the Defendants were medically erroneous, they cannot be

-17-

characterized as disregard for an excessive risk to Johnson's health.  See Farmer, 511 U.S. 825, 837 (1994).

Johnson alleges that the Defendants did little to relieve his chronic pain. However, once again, the administration of pain killers requires medical expertise and judgment.  Using pain killers entails risks that doctors must consider in light of the benefits. The Seventh Circuit has explained that:

> It would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating. Those recovering from even the best treatment can experience pain. To say the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd. It would also be absurd to say . . .that the Constitution requires prison doctors to administer the least painful treatment. That may be preferable, but the Constitution is not a medical code that mandates specific medical treatment.
>
> . . . .
>
> Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations. A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition."  Thomas v. Pate, 493 F.2d 151, 158 (7th Cir.1974), vacated and remanded on other grounds sub nom.  Cannon v. Thomas, 419 U.S. 813, 95 S.Ct. 288, 42 L.Ed.2d 39 (1974).

Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996), cert. denied, 519 U.S. 1126 (1997).

Johnson has submitted no affidavits to counter the affidavits in which each Defendant sets forth his or her reasons for the medical care given the Plaintiff.  Without any definition or explanation of the drugs and treatments prescribed, the finder of fact would have no basis for finding the Defendants' testimony to be in dispute. In sum, because Johnson has

-18-

not met his burden of showing that there is a genuine issue of fact on the subjective element of his Eighth Amendment medical treatment claim, the court will grant summary judgment in favor of the Defendants.

## ORDER

For the reasons explained above, the court **ORDERS** that the "Defendants' Motion for Summary Judgment" (filed January 14, 2005) **IS GRANTED**. See Federal Rule of Civil Procedure 56(c).

**IT IS FURTHER ORDERED** that this action is dismissed upon its merits.

**IT IS FURTHER ORDERED** that the Clerk of Courts shall enter a final judgment as a separate document. See Federal Rule of Civil Procedure 58. This judgment shall provide that:

> Plaintiff Jack Vincent Johnson brought this action against Defendants Matthew J. Frank, David Burnett, Sharon Zunker, George M. Daley, James Labelle, Sheri Heinz, James R. Wong, Kerin F. Sirin, Gary Bridgewater, Enrique Luy, Unknown Employees of WDOC, Administrator of University Wisconsin Hospitals & Clinics, Michael Lucey, David Mahvi and Patrice Kennedy before the court, the Honorable Thomas J. Curran, District Judge, presiding, and the issues having been heard and a decision having been duly rendered,
>
> **IT IS ORDERED AND ADJUDGED** that the Plaintiff take nothing and that this action is dismissed upon its merits and that the Defendants recover of the Plaintiff their costs of this action.
>
> Done and Ordered in Chambers at the United States Courthouse, Milwaukee,

Wisconsin, this 15th day of September, 2005.

s/ Thomas J. Curran
THOMAS J. CURRAN
United States District Judge

-19-